Baldwin, J. '
In this case the appellants, who have i r j recovered their freedom by a decree in their favour, ask a further decree for the profits of their labour, while they were held in slavery. It is not pretended that they stand upon any higher ground than if they had recovered their freedom and asserted their claim for profits in a Court of Law. Equity, in regard to the incidental as well as the principal demand, must follow the law, and if no such profits could be recovered at law, none can be had in equity. We must examine the case therefore upon the principles applicable to legal remedies.
The action in use for the recovery of freedom is trespass vi et armis, for assault and battery and false imprisonment. The object of it is to remove the claimant from the status of slavery to that of freedom ; and the form is wholly fictitious. The substantial judgment is that the plaintiff recover his freedom : the damages are merely nominal; and the omission of them would in no wise affect the validity of the proceeding. It is not incumbent upon the plaintiff to adduce evidence of any specific injury: he need prove no assault or battery, or imprisonment; nor would it be at all allowable for him to do so, the only matter in controversy being the plaintiffs’ alleged right to freedom.
This in the nature of things cannot be otherwise. Persons in the status of slavery are not entitled to any of the remedies of freemen: they are slaves whatever may be their right to freedom, and have no civil privileges or immunities. They are subject to the control, dominion and discipline of their masters, and must look to them for maintenance and protection. They cannot refuse them obedience, stand out against their authority, and assert collaterally a title to freedom. In truth, *14 while they remain in the status of slavery they have no personal rights, and of course no remedy by action for the redress of injuries.' The only suit they can bring is for the recovery of freedom ; and even during its pendency they still continue slaves, in the care, service and J J * * custody of their masters, without any restraint upon the authority and power of the latter, except such as is necessary for a fair trial and adjudication of the controversy.
A suit for freedom is founded upon the concession that the status of the claimant is that of slavery; otherwise the remedy would be inappropriate. For the restraint of his liberty a freeman need resort to no fictitious action, for the purpose of trying his right to freedom. His action is for the invasion of his subsisting personal rights, and he recovers damages for the specific injury he has sustained ; for a real, and not a supposed assault or battery, or false imprisonment. And against continued force he may invoke the high and summary remedy by writ of habeas corpus.
Persons are placed in the status of slavery by the condition of their birth : the offspring follow that of their mother: and if she be in bondage when she brings them forth, they are slaves also, and so continue for life, unless removed to the status of freedom by some competent jurisdiction or authority. The right to be so removed, in other words, the right to freedom notwithstanding the status of slavery, may be derived from inheritance, or acquired by emancipation ; but such right is only executory while the claimant remains in actual bondage.
The sources of the right to freedom are, 1. The white race in the maternal line; 2. The race, in the same line, of American Indians, for the period during which they could not lawfully be reduced to bondage; 3. Emancipation ; 4. Descent in the maternal line from individuals so entitled. Emancipation may be, 1. By *15 the voluntary act of the owner, when permitted, and in the mode prescribed by law; % By way of forfeiture for the violation or non-observance of statutory inhibitions or regulations; 3. By operation of laws of our sister states within their respective limits, as recognized within our own.
These various sources furnish the grounds of claim in suits for freedom; and the denial of them, with the conflicting allegation of uninterrupted bondage as incidental to the servile race of African, and, at one period, of Indian blood, constitute the matters of defence. Questions of law and fact are thus presented for the consideration of the Court and jury, not unfrequently of difficult solution. The intermixture of races, the obliteration of the physical marks of difference, the obscurity of pedigrees, the loss of evidence in regard to circumstances, conditions and formalities connected with emancipation, in its different modes, often occasion, in the lapse of time, (and no lapse of time is prescriptive against the right to freedom,) great perplexity and uncertainty in the attempt to reach the merits of the cause.
It may be supposed by some that the status of slavery imposed by the condition of birth, [or by purchase when it was allowed of captives from barbarous tribes,] is broken by emancipation, and that the latter, proprio vigore, places the individual on whom it is conferred in the legal status of freedom, though he should still remain in actual bondage. But a little reflection will serve to shew that this idea is not well founded. The original status can only be changed by a legal recovery, or actual, substantial and recognized enjoyment under the acquired title. It is doubtless true that if the person emancipated goes forth from bondage, asserting the privileges and exercising the rights of a freeman, with the consent or acquiescence of those from whom he has derived his title, he can no longer be regarded or treated by them, or those claiming under them, or by others *16 without paramount title, as a slave. He has thus attained the status of freedom, and may sue and obtain redress as a freeman for any specific violation of his . . c personal rights. But it cannot be true that one who has been continually held in bondage from his birth can, by any mere acquisition of title, be thereby removed to the status of freedom. Whatever title may be claimed, it is of course open to controversy, and the controversy must be determined by legal adjudication.
Take the strongest case of emancipation which can be put, that of voluntary manumission by the owner, under our revised act of 1819, 1 Rev. Code, p. 443, <§> 53, which provides that: “ It shall be lawful for any person, by his or her last will and testament, or any other instrument in writing, under his or her hand and seal, attested and proved, in the County or Corporation Court, by two witnesses, or acknowledged by the party in the Court of the county where he or she resides, to emancipate and set free his or her slaves, or any of them, who shall thereupon be entirely and fully discharged from the performance of any contract entered into during servitude, and enjoy as full freedom as if they had been particularly named and freed by this act.” This law does not authorize a slave to break away from his master, under a claim to freedom derived from an instrument of emancipation, alleged to have been executed and authenticated according to the provisions of the statute. The master, and those claiming under him, have a right to controvert its due execution, attestation and probat; to allege that it is a forgery, or that it was obtained by fraud or duress, or from a person legally or mentally incapable of performing such an act; or, in the case of a will, that the title which it might confer is defeated by the paramount rights of creditors: and pending such controversy, the claimants to freedom may still be retained in bondage, and employed and treated as slaves. Even the emphatic illustration given by the *17 language of the statute, of a special emancipation by express enactment of individuals by name, would not, in its actual occurrence, occasion a different result; for still the authority of the legislature to pass such a law, without providing adequate compensation, might be questioned and resisted until overcome by a judicial decisión.
Thus we see that persons in the status of slavery have no civil rights, save that of suing for freedom when entitled to it: they can make no contracts, nor acquire any property : they can obtain no redress by action against their masters or others, for personal injuries : they are in truth civiliter mortuus, and without protection of public authority, except that of the criminal law. How is it, then, that after having recovered in their action for freedom, they can maintain other actions founded upon what occurred to them while in actual bondage ? If they can, it must be upon the principle of relation; it must be because after the adjudication in their favour, they are to be regarded as freemen from the time that their title accrued. And if so, to what rights and remedies would they be remitted: would it be to other and greater than those of persons who had always been free ,• or to the personal rights of freemen, and the appropriate remedies for specific trespasses thereupon, such as battery or imprisonment, in which the recovery would be for a physical wrong, and not for a moral or legal constraint, in which the damages given would be for the injury sustained by the plaintiff, not for a benefit received by the defendant? But if it be true,as it unquestionably is, that persons in the status of slavery are, in contemplation of law, slaves, whatever may be their right to freedom, there can be no relation, to avail any thing, in behalf of those who have never occupied any other status, and who have therefore always been slaves, before their recovery of freedom.
*18 The action for mesne profits, after a recovery in ejectment, furnishes no principle to sustain a demand like this; for the proceeding by the possessory writ of ejectment is nothing more than the exercise, under the protection of the Court, of that right of entry which the law gives to the owner of land in case of disseisin. He might enter without suit, take peaceable possession of the property, appropriate the fruits there found, seize in specie those which had been removed therefrom, and maintain trespass for the issues converted by the disseisor, or those claiming under him. Green v. Biddle, 8 Wheat. 1, 75. The office of the ejectment is to remove opposition, quiet the regained possession, and establish its enjoyment. But the recovery in a suit for freedom is founded upon nothing in the nature of a disseisin and re-entry by the disseisee. Persons born in slavery have never been disseised of what they never were possessed, either actually or in legal contemplation: they cannot by their own act enter upon freedom and treat their masters as trespassers: their suit for freedom is not a possessory, but a droitural action ; and droitural actions do not by the common law give mesne profits, either by a recovery therein or in a subsequent action. 2 Saund. 45 m ; 1 Chitt. Plead. 222; Robert Pilford’s Case, 10 Coke 115; Shaw v. Clements, 1 Call 429.
If, therefore, instead of regarding freedom as a personal condition, we indulge the fanciful notion of treating it as property, still there is in the law of property no principle to give mesne profits after such a recovery. Nor is any to be found in the law of contracts, for between master and slave there can be no contract, express or implied.
The objections I have stated to the demand for profits go not to the want of a known form of action, but to ■the right of action in any form whatever. If upon legal principles, slaves recovering freedom were entitled to mesne profits, it would be the duty of the Courts to de *19 vise a form of action for their redress, or to adapt existing forms to that purpose. But we cannot strike out new doctrines, for the purpose of meeting cases of supposed hardship; though, doubtless, considerations of justice and policy may serve to throw light upon the investigation of legal principles.
A rule giving mesne profits to slaves, after a recovery of freedom, would operate harshly and often ruinously in regard to the master. The arrangements, management and expenditures of slave owners are, in a great measure, essentially different from those of persons who employ free labour in their occupations and service. The latter are, for the most part, in the habit of engaging individuals, from time to time, as the occasion may seem to require, and of dismissing them when found unsuitable or unnecessary; and are in no wise bound to provide gratuitously for their wants and comforts, or the maintenance of their families. The owner of slaves, on the contrary, is usually condemned to a constant, permanent and anxious burthen of care and expenditure. It seldom happens that more than a small proportion of them are capable of productive labour; while provision must be made for the food, clothing and shelter of all; for the helplessness of infancy, the decrepitude of age, the infirmities of disease; to say nothing of the heedlessness, slothfulness and waste natural to persons in their condition. Hence it is that the scantiness of net profit from slave labour has become proverbial, and that nothing is more common than an actual loss, or a benefit merely in the slow increase of capital from propagation.
An attempt to ascertain the actual pecuniary benefit derived by the master from the employment of his slaves would, it is obvious, in most cases, be utterly impracticable. An assessment or account of the profits must of necessity be wholly conjectural, and based upon estimated wages or hires of those capable of service, with an *20 allowance for drawbacks arising out of rearing the young, supporting the aged, and administering to the diseased. And what would be the condition of the master, after losing the slaves, when subjected to such an account or assessmeilt ? Any one of the least experience or observation in regard to the employment of slave labour may foresee the result.
Even such an account or assessment of mesne profits supposes the master to be at liberty to set off the expenses of those incapable of labour against the wages or hires of those who had rendered service. But this, it is obvious, he could not do. The compensation would go to those who had earned it: the expenses incurred for the rest, would belong to the master.
And where would be the reciprocity of such accounting? The slave would recover any balance found in his favour; but suppose it to be the other way, as where the expenses of his rearing should exceed the value of his services, what liability or responsibility would there be on his part ? And where would be the limit to such accounting? Mesne profits of land after a recovery in ejectment cannot be assessed for more than five years; but what statutory limitation would apply against the action of the slave for the mesne profits of his labour ?
If it be once conceded that slaves recovering their freedom are entitled to an account of mesne profits, I do not perceive upon what principle any exception to such a rule could be allowed in any case whatever. No delay on their part in asserting their claim to freedom, no acquiescence by them in the master’s enjoyment of their services, no ignorance, on his part, of their title, no concealment by them to his prejudice, could affect their rights in any the slightest degree: it being impossible to impute laches, consent, misrepresentation, or fraud, to persons in their condition. It would, moreover, be impracticable, in most cases, for the master, where he has notice of their claim, by yielding to it voluntarily, to *21 terminate the relation between them, and so avoid the continually accumulating responsibility for profits; for the law prohibits a master from suffering his slaves to go at large and conduct themselves as freemen, and subjects him to punishment for so doing; and in a proseention for such offence, he would be obliged to take upon himself the burthen of proving them entitled to freedom. This necessity he could not escape, unless by resorting to the expedient of executing to them a deed of emancipation; in doing which, he would have to encounter the difficulty of their refusing to accept the new, and it might be inferior title, thus conferred upon them; for his own title, irrespective of the question of freedom, might be defective, or imperfect, or of limited duration. He would, besides, incur the burthen imposed by law upon the emancipator and his estate, of supporting and maintaining those of unsound mind or body, or under the age of maturity; and if his title were that of a fiduciary, the risk of liability to his cestuis que trust.
On the other hand, if the rule be established to refuse mesne profits to slaves recovering their freedom, there is no principle upon which we can withhold its uniform application. Every man has an unquestionably legal right to controvert any demand against him, for such reasons as he may deem sufficient, and all defences are in the eye of the law equally unfounded after their condemnation by a judicial decision. In the absence of an express statutory provision, no injustice or impropriety in the defence, or in the mode of conducting it, can warrant a recovery beyond the intrinsic merits of the demand, and the costs of litigation.
In point of abstract justice, it may seem reasonable enough that slaves recovering their freedom should be entitled to an account of mesne profits: but a slight examination will serve to shew that the question is anomalous in its character, and arises out of a peculiar *22 organization of society, affecting the condition and rights of persons in a way unknown to the principles of the common law. Slavery is with us an institution founded ^ upon a distinction of races, one of which is subject to contl’°l an(3 domination of the other. The servile race, from colour, and other physical traits, carry with them indefinitely the marks of inferiority and degradation ; and even when relieved from bondage can never aspire to association and citizenship with the white population. Freedom to them is a benefit rather in name than in fact; and in truth, upon the whole, their condition is not thereby improved in respectability, comfort, or happiness. While they remain in what is here their original status, provided for as they are in infancy, old age, and infirmity, they are exempt from the cares and anxieties of a precarious subsistence, and the wretchedness of actual want; and those who are most familiar with the usually mild despotism to which they are subject, can best appreciate their sources of enjoyment from the commonly humane indulgence, and kind regards of their masters. Compare this with the new condition into which they enter as free negroes or mulattoes, and there is no difficulty in believing that, in most instances, no practical injustice will be done them, by striking an even balance of profit and loss between them and their former masters. And it is easy to perceive that to give them, besides their freedom, a pecuniary recovery for past servile labours, would not promote those habits of industry, temperance and humility, without which their recently acquired liberty must prove a curse instead of a blessing.
Cases doubtless may occur of peculiar hardship and oppression, (and possibly this is of that description,) which might be suitably provided against by a judicious and well guarded legislation; but we must leave that subject to the proper department of the government, and *23 content ourselves with administering the law as we find it. As yet we have had no manifestation of the legislative will to warrant us in superadding mesne profits to the recovery of freedom : on the contrary, the negative evidence is strongly the other way. Our statute regulating suits for freedom has, with great humanity and forecast, made ample provision for the prompt, safe, and easy assertion of the demand, and its fair, speedy and effectual trial; and yet in no wise provides any mode of proceeding for the recovery of mesne profits; for which, considering the inherent difficulties of any remedy upon common law principles, the obvious reason that occurs is that no such recovery was contemplated. The omission of all general and permanent legislation on the subject is the more remarkable, when, by turning to the statute book, we find a particular class of cases expressly provided for, of rare occurrence and fleeting exigency, but unquestionable hardship. By an act of October 1783, 11 Hen. Stat. 308, 9, slaves whose masters had caused them to be enlisted as freemen, in the armies which achieved our independence, were thereby emancipated ; and the attorney general was directed to prosecute actions, in forma pauperis, in their behalf, if detained in servitude ; and if it should appear that they were entitled to freedom by the statute, a jury was to be empanneled to assess damages for their detention.
I am well satisfied, for the reasons above suggested, that persons born in slavery who recover their freedom have no right to mesne profits, unless under the provision of some special statute: and if the question were doubtful upon principle, I think it ought to be treated as settled by authority. By the decisions of this Court, cited by the appellants’ counsel, for the purpose of an ingenious criticism thereupon, all claims for mesne profits were expressly repudiated; and some of the earlier Judges in their opinions bore emphatic testimony to the uniform course of our Courts, in denying them under all *24 circumstances, and however gross and palpable the violation of the right to freedom.
I think there is no error in the decree of the Circuit Court.
The other Judges concurred in the opinion of Baldwin, J.
Decree affirmed.